J.A21002/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

JUSTIN BADA AND KIMBERLY BADA, H/W:

    Appellants

      v.

COMCAST CORPORATION

JUSTIN BADA AND KIMBERLY BADA, H/W:

    Appellants

      v.

COMCAST CC OF WILLOW GROVE AND
COMCAST OF SOUTH JERSEY, LLC

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 2479 EDA 2014

Appeal from the Order Entered July 17, 2014
In the Court of Common Pleas of Philadelphia County
Civil Division No(s).: January Term, 2013 No. 2242
March Term, 2013 No. 1031

BEFORE: ALLEN, MUNDY, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:      **FILED AUGUST 21, 2015**

Appellants, Justin Bada and Kimberly Bada, husband and wife, appeal from the order of the Philadelphia County Court of Common Pleas granting summary judgment in favor of Appellees, Comcast CC of Willow Grove and

---

[*] Former Justice specially assigned to the Superior Court.

Comcast of South Jersey, LLC in these consolidated cases.[1]  Appellants contend the trial court erred in granting summary judgment based upon the exclusivity rule of the New Jersey Worker' Compensation Act[2] ("Act").  We affirm.

We adopt the facts and procedural history as set forth by the trial court in its opinion.  **See** Trial Ct. Op., 1/22/15, at 3-6.  On July 17, 2014, the trial court granted summary judgment in favor of Appellees.[3]  Appellant Justin Bada's negligence claim against his employer and his wife's loss of

---

[1] The trial court consolidated these cases.  **See** Order, 5/2/13.  Comcast Corporation was dismissed by agreement of the parties.  **See** Stipulation of Dismissal of Comcast Corp., 8/28/13.

[2] N.J. Stat. Ann § 34:15-8.

[3] Following oral argument on Appellees' motion for reconsideration of the trial court's denial of the motion for summary judgment, summary judgment was granted.  The trial court opined:

> This [c]ourt denied [Appellees'] motion . . . based upon this [c]ourt's analysis and determination of a substantial question of fact existing as to who was, in fact, [Appellant's] employer at the time of this incident.
>
> \*   \*   \*
>
> Now, in reviewing this motion for reconsideration and the response thereto, it is clear that [Appellant Bada], did, in fact, admit, for purposes of this motion, that the moving [Appellees] w[ere], in fact, his employer[s] at the time of this accident.

N.T., 7/17/2014, at 11, 12.

J.A21002/15

consortium claim were barred by the Act. This timely appeal followed.[4]

Appellants filed a timely court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal and the trial court filed a responsive opinion.

Appellants raise the following issue[5] for our review:

> Whether the Lower Court erred when it granted Comcast's Motion for Summary Judgment based on the exclusivity rule of the New Jersey Workers' Compensation Act[6] since, when the evidence is viewed in the light most favorable to . . . Appellants, the present case falls squarely within the "intentional wrong" exception to that rule?

Appellants' Brief at 6.

Appellants argue that the exclusivity provision of the Act is inapplicable in the instant case based upon "an exception to that rule for injuries that result from 'intentional wrongs' on the part of the employer." **Id.** at 11. This determination is based upon a two part test, *viz.*, a conduct prong and and a context prong. **Id.** at 15, 16, 19. In order to satisfy the conduct prong, Appellants contend a jury must resolve the issue of whether there was "an objectively reasonable basis for expecting that [the accident] almost certainly would occur." **Id.** at 17 (citing **Van Dunk v. Reckson Assocs.**

---

[4] We note that Appellees filed an application to quash the appeal which was denied by this Court. **See** Order, 3/23/15.

[5] Appellants raised additional issues in their Rule 1925(b) statement which are not addressed in their brief. Therefore, they are abandoned on appeal. **See Eiser v. Brown & Williamson Tobacco Corp.**, 938 A.2d 417, 429 (Pa. 2007) (plurality).

[6] **See** N.J.Stat.Ann. § 34:15–8.

- 3 -

***Realty Corp.***, 45 A.3d 965, 978 (N.J. 2012)). Appellants aver the facts of the case "could certainly lead a jury to conclude that Mr. Bada's supervisor knew it was a 'virtual certainty' that using a ladder that evening could cause someone to be injured." ***Id.*** at 19.

Appellants argue "[o]nce the conduct prong is satisfied, the next phase of the inquiry calls for the [c]ourt to determine whether the employer's actions 'constitute a simple fact of industrial life or are outside the purview of the conditions the [New Jersey] Legislature could have intended to immunize under the Workers' Compensation bar." ***Id.*** at 19 (citing ***Laidlow v. Hariton Mach. Co.***, 790 A.2d 884, 898 (N.J. 2002)). They conclude this prong was satisfied based upon the facts of this case because "there can be no question that Mr. Bada's supervisor and the senior field technician knew that the ladder was going to topple." ***Id.*** at 20.

Our review is governed by the following principles:

> The standards which govern summary judgment are well settled. When a party seeks summary judgment, a court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. A motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Finally, the court may grant summary judgment only when the right to such a judgment is clear and free from doubt. An appellate court may reverse the granting

of a motion for summary judgment if there has been an error of law or an abuse of discretion. . . .

***Varner-Mort v. Kapfhammer***, 109 A.3d 244, 246-47 (Pa. Super. 2015)

(citation omitted).

The Act provides, in pertinent part, as follows:

> **Election surrender of other remedies**
>
> Such agreement shall be a surrender by the parties thereto of their rights to any other method, form or amount of compensation or determination thereof than as provided in this article and an acceptance of all the provisions of this article, and shall bind the employee and for compensation for the employee's death shall bind the employee's personal representatives, surviving spouse and next of kin, as well as the employer, and those conducting the employer's business during bankruptcy or insolvency.
>
> If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, **except for intentional wrong**.

N.J. Stat. Ann. § 34:15-8 (emphasis added). The New Jersey Supreme Court opined:

> The Act's remedy is exclusive, except for injuries that result from an employer's "**intentional wrong**"; for those, an injured employee is permitted to maintain a common-law tort action against the employer. . . . As the case law demonstrates, an employer's deliberate intent to injure is not the sine qua non; instead **a substantial certainty that injury or death will result must be demonstrated**.
>
> *     *     *

> ***Millison*** [***v. E.I. du Pont de Nemours & Co.***, 501 A.2d
> 505 (N.J. 1985)] instructed courts, when assessing claims
> of intentional wrong, to engage in a two-step analysis.
> First, a court considers the "conduct prong," examining the
> employer's conduct in the setting of the particular case.
> Second, a court analyzes the "context prong," considering
> whether "the resulting injury or disease, and the
> circumstances in which it is inflicted on the worker, [may]
> fairly be viewed as a fact of life of industrial employment,"
> or whether it is "plainly beyond anything the legislature
> could have contemplated as entitling the employee to
> recover **only** under the [ ] Act."

***Van Dunk***, 45 A.3d at 966, 972 (some emphases added and some citations

omitted).

> In general, the same facts and circumstances will be
> relevant to both prongs of ***Millison***. However, as a
> practical matter, when an employee sues an employer for
> an intentional tort and the employer moves for summary
> judgment based on the Workers' Compensation bar, the
> trial court must make two separate inquiries. The first is
> whether, when viewed in a light most favorable to the
> employee, the evidence could lead a jury to conclude that
> the employer acted with knowledge that it was
> substantially certain that a worker would suffer injury. If
> that question is answered affirmatively, the trial court
> must then determine whether, if the employee's
> allegations are proved, they constitute a simple fact of
> industrial life or are outside the purview of the conditions
> the Legislature could have intended to immunize under the
> Workers' Compensation bar. Resolving whether the
> context prong of ***Millison*** is met is solely a judicial
> function. Thus, if the substantial certainty standard
> presents a jury question and if the court concludes that the
> employee's allegations, if proved, would meet the context
> prong, the employer's motion for summary judgment
> should be denied; if not, it should be granted.

***Laidlow***, 790 A.2d at 898.

The facts in ***Van Dunk*** are as follows:

On August 10, 2004, at the Giralda Farms construction site, James[7] was excavating a trench to relocate a dewatering sump in a retention pond. Prior to that date, the project had been plagued by thunderstorms and heavy rain that had required work to be redone, without additional compensation to James. Rain was expected again later that day; as a result, [J.D.] Potash[8] and [Glenn] Key[9] sought to complete the sump relocation before the rain arrived. The sump relocation involved the following steps: digging a sloped trench; laying down first a filter fabric and then a layer of stone; placing a pipe on the stone; placing more stone on the sides and top of the pipe; and then wrapping additional filter fabric around the stone. As the trench excavation continued and its slope reached a depth of greater than five feet, Van Dunk and other workers began laying down the filter fabric from locations outside the trench. Eventually, **the deepest part of the trench reached a depth of eighteen to twenty feet**.

OSHA[10] safety regulations mandate that workers cannot enter a trench that is deeper than **five feet** if protective systems are not in place. A protective system is defined as "a method of protecting employees from cave-ins, from material that could fall or roll from an excavation face or into an excavation, or from the collapse of adjacent structures." James's Safety Program similarly requires use of protective systems to guard against cave-ins. Proper sloping and use of trench boxes are common protective systems, but for various reasons, Key determined that OSHA-compliant sloping could not be utilized at the trench's location, and a trench box was not employed.

---

[7] James Construction Company, Inc. ("James") was Van Dunk's employer. **Van Dunk**, 45 A.3d at 967.

[8] Potash was James' president. **Id.**

[9] Key was the project superintendent.

[10] Occupational Safety and Health Administration.

Key and his workers experienced difficulty when laying down the filter fabric from their locations outside the trench. Despite their efforts, the fabric would not lay flat. It became tangled and a crease developed. Van Dunk volunteered to go into the trench to straighten the filter fabric, but Key told him not to do so because of the possible risks attributable to the ground conditions. However, as problems persisted with laying the filter fabric, in what **Key** later described as a moment of "frustration" he **told Van Dunk to go in and straighten the fabric**. Van Dunk went into the trench, walked to the deeper end, and began adjusting the fabric. He was in the trench for less than five minutes when a loud noise was heard and a trench wall caved in, burying Van Dunk to his chest. He sustained **multiple serious injuries**. He was rescued by coworkers who immediately responded to help him, some of whom jumped in to dig him out, and by police and emergency personnel.

*Id.* at 967-68 (citations and footnotes omitted and emphases added).

The *Van Dunk* Court declined to find an intentional wrong and opined:

The existence of an uncontested finding of an OSHA safety violation in the wake of this workplace injury does not establish the virtual certainty that *Millison* demands. An intentional wrong must amount to a **virtual certainty** that bodily injury or death will result. A probability, or knowledge that such injury or death "could" result, is insufficient. Thus, the question here is whether in light of the clear violation of the OSHA safety requirements pertaining to trenches deeper than five feet, there was substantial certainty of injury or death. On the facts presented, we cannot reach that conclusion without causing a substantial erosion of the legislative preference for the workers' compensation remedy.

*Id.* at 978 (citation omitted and emphasis added). In *Van Dunk*, the New Jersey Supreme Court opined: "No doubt, the circumstances in this matter are tragic. Although the proofs plaintiff advances could support a finding of gross negligence, that finding is insufficient to circumvent the statutory bar

- 8 -

and maintain an action against plaintiff's employer." ***Van Dunk***, 45 A.3d at 967.

Instantly, the trial court opined:

> [Appellant] worked outdoors and that would include working in inclement weather as a regular part of his job. He was not ordered by his supervisor, John Gonzalez, to climb the ladder. Mr. Gonzalez, in fact, sent a more experienced colleague, Chris Aten, to assist [Appellant] at the location. He was injured when it was determined that climbing the ladder under these conditions would not be safe. [Appellant] admitted he never climbed the ladder and had been requested by Mr. Aten "to brace the side of the ladder while he unhooked it and lowered the extension ladder."
>
> [**Appellant**] **was never forced to climb the ladder or engage in any activity where serious injury or death was substantially certain**. Based upon the facts, it can be reasonably concluded that [Appellant's] injury occurred solely within the course and scope of his employment and within the bounds of industrial life. As a result, his claim falls squarely within the confines and remedies available to him as an incident contemplated by the legislature under the [Act]. In light of this, [Appellees] are entitled judgment in their favor.

Trial Ct. Op. at 11 (citations to record omitted and emphasis added). We agree no relief is due.[11]

Appellant testified *via* videotape deposition regarding the weather on the date of the incident. "In the morning, it was overcast, and I think it was

---

[11] We note that Appellant Kimberly Bada's derivative loss of consortium claim is barred due to the applicability of the Act. ***See Cominsky v. Donovan***, 846 A.2d 1256, 1260 (Pa. Super. 2004) (citing ***Scattaregia v. Shin Shen Wu***, 495 A.2d 552 (Pa. Super. 1985) (holding "loss of consortium claim is dependent upon the injured spouse's right to recover")).

possibly drizzling, with some wind. But as the day got later, the wind and the rain got severely worse." N.T., 3/11/14, at 114. When asked if he complained to his employer about having to work in inclement weather, he stated "it's the nature of the job and we understand that there's going to be rainy days" and it is also part of the nature of the job that there may be wind. *Id.* at 119.

He testified that Appellees never disengaged any safety mechanisms on any equipment that he had during his employment. *Id.* at 165. Based upon the weather and location of the pole he had to work on, Appellant called his supervisor because he "didn't feel safe . . . ." *Id.* at 173, 176. John Gonzalez, the supervisor, told Appellant that he would call Chris Aten.[12] *Id.* at 177. Gonzalez said to get back to him after Chris arrived. *Id.* at 180.

Appellant explained what transpired after Mr. Aten arrived:

> He said stand next to him. He told me he was going to put up the ladder and he'd see what happened.
>
> He put up the ladder. And almost as immediately as the hooks went over the strand, another big wind gust came in and the ladder was buckling in the center, like, where the extension piece is, I guess where the extension piece crosses over the lower part of the extension ladder.
>
> And he said something along the lines of, **Oh, no. This—we can't do this. This—ain't safe**.

\* \* \*

---

[12] Mr. Aten "was a co-worker of [his] from Comcast, a fellow technician." *Id.* at 156.

And then he asked me to brace the side of the ladder while he unhooked it and lowered the extension ladder. And at that point, I was to his left. And I braced my hands against the side of the ladder like such, where I—because it's an extension ladder, I could not close my thumbs on it, as we were taught, because you can get your thumbs caught in there (indicating). So, as a safety practice, I put my hands flat against it just to kind of brace against the incoming wind.

And that was the assistance he asked of me. And I thought, you know, he probably needed that, because at that point, once he unhooked it again, that ladder could blow over. And his truck was facing that way too. Who knows? It could have hit the truck, broke the windshield or something. So, I though, you know, this is something where I need to held him.

At that point, that's when he—almost as soon as he unhooked the ladder, the wind blew. And the next thing I know, I'm being pushed over, the ladder falls on me, and I'm laying on my side, half in a puddle, half on the ground.

*Id.* at 199, 200-01. His deposition testimony continued:

[Counsel for Appellees:] Other than the fact that you thought it was too—that the conditions were unsafe to do the job. So, other than that, was there anything about the way that Chris was trying to get the ladder up that you thought was not the proper methodology for getting a ladder up over a strand?

A: No. Other than the conditions, he's—always been pretty good with the ladder. I mean, as I said previously, that's why they called him Ninja.

\* \* \*

Q: From what you could tell, **as soon as Mr. Aten determined that it was unsafe, did he try to stop proceeding with the job**?

A: **Yes**.

- 11 -

Q: And then describe for me that exact moment. So he's decided it's unsafe.

Then what happened?

A: That's when he has to lower the ladder.

Q: So, what did he do?

A: That's when he asked me to brace the side of the ladder while he unhooked it from the strand and lowered the extension part.

\* \* \*

Q: And he unhooked it from the strand?

A: Yes.

Q: While you were bracing it?

A: Yes.

Q: And then what happened?

A: That's when it was blown over by the wind and I got hit by it. And I was—you know, the next thing I know, I'm on the ground and the ladder's on the ground and—you know.

\* \* \*

Q: And did you go to a doctor that day?

A: I believe—yeah. I believe I went to a couple of places that day. I believe they sent me to Dr. Glenn's office, who checked me out and then sent me for an x-ray. And I think I—I even probably—I think I took a urinalysis or something at that point, too.

Q: When you said "they sent me," who's "they"?

A: The supervisor who I had told.

Q: And who's Dr. Glenn?

A: That was the—I guess the head practitioner of the doctor's office that I was sent to. I believe the doctor I first saw was Dr. Bozik, if that's how you pronounce it.

\* \* \*

Q: . . . What injuries do you attribute to the incident?

\* \* \*

A: . . . To the best of my knowledge, my anterior cruciate ligament was torn in my left knee. There was damage to my meniscus.

Q: In your left knee?

A: In my left knee as well.

I had pain in my right knee. Through different x-rays and whatnot, there was determined to never be—to not be any—anything significant to require any type of major treatment.

To this day, the pain comes back right—like, here and there, but not—not anything significant.

I had a forearm contusion, which basically that—went away about a week after. It was just kind of, like, a bruise and—then I have two—how did the doctors put it? I think they call it bulging disks in my lower spine. . . .

I'm not sure of the back terminology as much. But there were two—two disks in my lower back that were also bulging and I've had pain. I've had times where I've had numbness that's shot down my right leg.

I currently have pain within and throughout my left knee. I have numbness on the bottom front of my left knee. You know, a radiating back pain, which also kind of goes hand in hand with that numbness that I sometimes feel in my right leg.

Q: Are there any other injuries that you attribute to the incident?

A: As far as I know, no.

*Id.* at 209, 213, 214, 237, 242-43.

The **Van Dunk** court found that although the circumstances in that case were tragic, they were not sufficient to circumvent the statutory bar of the Act. **See Van Dunk**, 45 A.3d at 967. Instantly, Appellants have not demonstrated that Appellees' conduct constituted an intentional wrong creating a substantial certainty that injury or death would result. **See id.**; **Laidlow**, 790 A.2d at 898. Therefore, we find the facts in the case *sub judice* were insufficient to satisfy the exception to the exclusivity provision of the Act. **See Van Dunk**, 45 A.3d at 966, 972. We discern no abuse of discretion by the trial court in granting Appellees' motion for summary judgment. **See Kapfhammer**, 109 A.3d at 246-47.

Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/21/2015

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| JUSTIN BADA AND KIMBERLY BADA : | JANUARY TERM, 2013 | **RECEIVED** |
| v. : | | JAN 2 1 2015 |
| COMCAST CORPORATION, et al : | NO. 2242 | J. EVERS<br>DAY FORWARD |

| | |
|---|---|
| JUSTIN BADA AND KIMERBLY BADA : | MARCH TERM, 2013 |
| v. : | |
| COMCAST CC OF WILLOW GROVE : | NO. 1031 |
| : | SUPERIOR COURT APPEAL |
| : | NO.: 2479 EDA 2014 |

## OPINION OF THE TRIAL COURT

This is the appeal of Plaintiffs, Justin Bada and Kimberly Bada, husband and wife, from this Court's Order granting summary judgment in favor of the defendants. Summary judgment was initially denied by this Court on June 5, 2014, however, due to an error of fact made by this Court, a fact which was pertinent to the determination to initially deny the defendants' motion, reconsideration was subsequently granted at the defendants' request.

On July 17, 2014, after oral argument on the reconsideration motion, this Court vacated its June 5, 2014 Order and entered summary judgment in favor of defendants, thereby terminating the litigation.

Bada Etal Vs Comcast Cc Of Willow Grove Eta-OPFLD



13030103100043

1

On appeal, the Plaintiffs have raised the following issues:

1. The Court erred in granting Defendants' Motion for Reconsideration of June 5, 2014 Order Denying Motion for Summary Judgment, and vacating the Court's Order of June 5, 2014 and entering summary judgment in favor of Defendants (hereinafter collectively referred to as "granting Defendants' Motion for Summary Judgment") where there was (1) no clear error of law or fact resulting in manifest injustice; (2) no newly discovered evidence that was not available when the Court denied the motion; and (3) no intervening change in controlling law. *See Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985); *Max's Seafood Cafe, by Lou Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

2. The Court erred in granting Defendants' Motion for Summary Judgment where Plaintiffs' claims fall squarely within the " intentional tort" exception to the New Jersey Workers' Compensation Act ("WCA") because the totality of the facts of this case indicate that (1) a jury could reasonably conclude that Defendants acted with knowledge that Plaintiff Justin Bada's injury was substantially certain to occur, and (2) it may be determined, as a matter of law, that Defendants' actions were plainly beyond anything the legislature could have contemplated as entitling the employee to recover only under the New Jersey WCA.

3. The Court erred by applying the wrong test to the facts of this case and stating that New Jersey law requires that plaintiff prove "actual intent or subjective desire to injure" in order to recover for intentional wrong pursuant to an exception to the Workers' Compensation bar, when in fact New Jersey law requires only "substantial certainty" that injury will occur, and not "actual intent" or "subjective desire" to injure. Hearing Transcript dated July 17, 2014 at 16:10-15. *See Laidlaw v. Hariton Machinery Co., Inc.*, 170 N.J. 602,613,790 A.2d 884, 891 (2002); *Millison v. E.I. du Ponte de Neumours & Co.*, 101 NJ, 16 1, 178-79,501 A.2d 505 (1985).

4. The Court erred in granting Defendants' Motion for Summary Judgment pursuant to Rule 1035.3 of the Pennsylvania Rules of Civil Procedure, as well as supporting Pennsylvania case law, where Defendants have improperly supported their motion for summary judgment solely with deposition testimony, thereby raising a genuine issue of material fact because the cause of action is dependent upon the credibility of the witnesses who will testify at trial, especially that of Plaintiff Bada's supervisor, John Gonzalez, who issued Plaintiff Bada's orders on the day of the incident.

5. The Court erred in granting Defendants' Motion for Summary Judgment where Plaintiff Kimberly Bada's claims are derivative of Plaintiff Justin Bada's claims, and for the reasons set forth above, the Court erred in

2

granting Defendants' Motion for Summary Judgment as to Plaintiff Justin Bada's claims.

For the reasons set forth herein, the issues raised by Plaintiffs are not supported either in fact or in law, and summary judgment was properly entered in Defendants' favor.

Plaintiffs claim that on March 10, 2011, Justin Bada, an employee of Comcast of South Jersey, LLC, was injured while working. Mr. Bada, and his wife, Kimberly Bada, are residents of New Jersey. Although they are still married, they have been separated for nearly two years.

At the time of the incident, Mr. Bada's title with Comcast was Communication Tech 3, a field technician, based out of Comcast's Vineland, New Jersey office. Mr. Bada performed field work throughout parts of southern New Jersey. As of March 2010, Bada had been a field technician for a little more than a year.

Mr. Bada's employer, Comcast of South Jersey, LLC, is a legal entity holding a franchise license to provide cable services in Monroe Township, New Jersey, the location of Bada's accident which occurred on March 10, 2011.

Comcast Cable Communications Management is a Delaware entity with an address located in Philadelphia, Pennsylvania. This company provides payroll reporting services for the various Comcast corporate entities, including Comcast of South Jersey, LLC. It does business under the fictitious name "Comcast of Willow Grove". In this capacity, and pursuant to of the Internal Revenue Code, Comcast Cable Communications Management was identified as the "wage payor agent" of Comcast of South Jersey, LLC, and Comcast of Willow Grove was listed on the Plaintiff's W-2 as his employer.

At the time of the incident giving rise to this litigation, John Gonzalez was Bada's supervisor. Gonzalez is also an employee of Comcast of South Jersey, LLC, and has held the title of "Technical Supervisor" for 11 years. In his role as a Technical Supervisor, Gonzalez is

3

responsible for supervising and supporting field technicians, providing them with technical assistance and recertifying them on ladders and various field jobs. See *N.T. Gonzalez Dep., 20:4-14.*

Chris Aten, one of Bada's fellow technicians, was at the job site at the time of Bada's injury. Aten is also an employee of Comcast of South Jersey, LLC. Aten's, and Gonzalez' W-2's for the year of the incident also list Comcast of Willow Grove as their employer. The error of fact made by this Court stemmed from the confusion in the pleadings, motions and deposition, leading this Court to conclude that a material issue of fact existed as to the entity who would be deemed Mr. Bada's employer at the time of injury, which would determine whether this matter was strictly a worker's compensation claim or potentially impose third party liability.

This issue was resolved at oral argument on the reconsideration motion, as Mr. Bada's counsel confirmed that Comcast of South Jersey, LLC, was, in fact, his employer. See *July 17, 2014 Transcript, Page 10, Lines 14-22.* Once this issue was clarified, it was necessary for this Court to determine if Mr. Bada's injury was compensable under an exception to the New Jersey Worker Compensation Act.

On March 10, 2011, Bada was working in the Williamstown, New Jersey area. See *N.T. Bada Dep., 142:22-143:6.* Toward the end of his work day, Bada received instructions regarding a job to perform at the intersection of Williamstown Road and Corkery Lane in Williamstown, New Jersey. See *N.T. Bada Dep., 151:3-152:23.* The job involved re-hanging a downed wire or wires that connected customers' houses to a pole at the street. See *N.T. Bada Dep., 168:4-169:17.*

Due to inclement weather, Bada was concerned about climbing his ladder to perform the repair. See *N.T. Bada Dep., 182:13-18.* Bada called his supervisor (Gonzalez) to inform him that

4

he did not think it was safe to do the work, and requested that the job be postponed until the morning or re-assigned to a bucket truck. See *N.T. Bada Dep., 176:6-14.* According to Bada, Gonzalez informed him that that the job had to be completed that night because the customer had phone service ("CDV" in Comcast parlance). See *N.T. Bada Dep.177:17-23.* Bada testified that customers with CDV cannot have a delay in repairs because a lack of phone service could "pose a health risk" as these customers need to be able to call 911 or "Life Alert." See *N.T. Bada Dep., 178:7-15; 181:5-13.*

Gonzalez also told Bada that he did not have a maintenance tech (the type of Comcast technicians with bucket trucks) on duty. *Id. at 177:17-19.* However, Gonzalez did not ignore Bada's request and did not force Bada to ascend the ladder; rather, Gonzalez told Bada that he would have another employee, Aten, come to the job location to assist Bada, telling him to "have him [Aten] check it out" and then get back to Gonzalez. *Id. at 180:11-15.*

After Aten had arrived, he and Bada spoke about the job, and Bada reiterated his concerns about the weather and the need for a bucket truck. *N.T. Bada Dep., 196:12-25.* In response, Aten told him that they would use the ladder to test the wind for safety. *N.T. Bada Dep., 197:11-13 and 197:24-198:5.* Bada explained that he "yielded to [Aten's] expertise, because he had been a tech a lot longer." *N.T. Bada Dep., 198:8-9.* According to Bada, once the ladder was up, Aten decided that it was too windy to do the job, and they began to lower the ladder. *N.T. Bada Dep., 199:7-19; 213:3-11.* The only assistance Aten asked of Bada was "to brace the side of the ladder while he unhooked it and lowered the extension ladder." *N.T. Bada Dep., 200:22-201:10.*

Neither Bada nor Aten testified that either of them *ever* got on the ladder and no one directed Bada to climb the ladder. Mr. Bada, and his co-worker simply put the ladder up and

5

then, due to conditions took it back down. According to Bada, as the ladder was lowered, it was blown over by a "stronger gust" of wind, *N.T. Bada Dep., 209:21*, and Bada fell to the ground. *N.T. Bada Dep., 214:10-13.* Bada testified that the ladder pushed him, although he could not determine "what part of the injury was from a ladder impact and which part of the injury was from, like, a twist and pull of being pushed over." *N.T. Bada Dep., 215:4-9 and 20-24.* Bada reported the injury to his employer and applied for worker's compensation benefits. *N.T. Bada Dep., 267:23-25.* Bada expects to receive compensation from this process and stated that worker's compensation has been paying his medical expenses. *N.T. Bada Dep., 302:5-8; N.T. Bada Dep., 255:10-256:12.*

Procedurally, these cases were filed by plaintiffs in January and March of 2013. They were consolidated by Court Order on May 2, 2013. Comcast Corporation was dismissed from the case via a Stipulation of Dismissal. Discovery closed on April 7, 2014 and on April 30, 2014, Defendants moved for summary judgment on all claims brought against them by Plaintiffs. Thereafter, this Court issued an Order denying the Defendants' Motion for Summary Judgment.

On June 13, 2014, Defendants moved for reconsideration of the Court's June 5, 2014 which was granted by this Court. On July 17, 2014, after oral argument, summary judgment was entered in favor of the Defendants. On August 13, 2014, the Plaintiffs filed a timely Notice of Appeal.

As stated above, the Plaintiffs claim that this Court 1) erred in granting Defendant's Motion for Reconsideration; 2) erred in determining Bada's injury fell within the intentional tort exception of the New Jersey Worker Compensation Act; 3) erred by applying the wrong test to the facts in granting summary judgment; 4) erred in granting summary judgment under Rule

1035.3 and the Nanty-Glo rule; and, 5) erred in dismissing Mrs. Bada's derivative consortium claim.

Each of Plaintiffs' claims of error are without legal basis. This Court determined the Defendants' request for reconsideration of its' prior order was properly granted, and, thereafter, properly granted summary judgment in favor of the Defendants on all claims.

This Court has the authority to grant a Motion for Reconsideration as "[a] court has the inherent power to reconsider its own rulings." *Joseph F. Cappelli & Sons, Inc. v. Keystone Custom Homes, Inc.*, 2003 PA Super 8, ¶ 24, 815 A.2d 643, 648 (2003) (citing *Atlantic Richfield Co. v. J.J. White, Inc.*, 302 Pa.Super. 276, 448 A.2d 634, 636 (1982)).

A Motion for Reconsideration may be granted if the court (1) made a clear error of law or of fact resulting in manifest injustice, (2) newly discovered evidence has become available when the original motion was decided, or (3) there has been intervening change in controlling law. *Id.*

This Court determined that it had committed a clear error of fact in its initial denial of the Defendants' Motion for Summary Judgment which warranted reconsideration of the legal issues. After oral argument, this Court vacated its original denial of summary judgment and entered summary judgment in favor of the Defendants.

With the Court's acknowledgment of an error of fact on the record, it then looked to determine if any genuine issues of material fact existed and, if not, were the Defendants entitled to judgment in their favor as a matter of law. Pursuant to Pa.R.Civ.P. 1035.2, the standard for summary judgment is as follows:

> "After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or (2) if, after the completion of discovery relevant to the motion, including the

7

production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury." **Pa. R. Civ. P. 1035.2.**

Summary judgment is appropriately granted where the record demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 812 A.2d 1218, 1221 (Pa. 2002). At the summary judgment stage, "[f]acts and reasonable derivative inferences are generally considered in the light most favorable to the non-moving party, and doubts are resolved against the moving party." *Lance v. Wyeth*, 85 A.3d 434, 449 (Pa. 2014). "In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt." *Summers v. Certainteed Corp.*, 997 A.2d 1152, 1159 (Pa. 2010) (internal citation omitted).

Although jurisdiction in this matter properly lies in Pennsylvania as one of the defendants has its address in Philadelphia, New Jersey worker's compensation law applies to the Badas' claims. Counsel for all parties in their various pleadings and motions have acknowledged that New Jersey's Worker Compensation Act (WCA) applies.

The New Jersey WCA establishes a very high bar for employees to recover damages from their employer outside of the Act itself. Section 34:15 of the WCA provides, in part,

> "If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, *except for intentional wrong.*"
> **N.J. Stat. Ann. § 34:15-8.** [Emphasis added.]

The New Jersey Supreme Court has held that the compensation act's "remedy is exclusive, except for injuries that result from an employer's 'intentional wrong.'" *Van Dunk v.*

8

*Reckson Assoc. Realty Corp.*, 45 A.3d 965, 966 (N.J. 2012). The "intentional wrong" standard goes well beyond negligence or recklessness of a known risk and requires that a "substantial certainty" for injury is likely to take place. *Id.*, at 971-72.

The Defendants properly set forth this standard in their Motion for Summary Judgment. The Plaintiffs now claim on appeal that this Court mistakenly applied an even stricter standard of "actual intent or subjective desire to injure." Plaintiffs have drawn this conclusion by taking the Court's comments in rendering its decision out of context. Plaintiffs are correct that New Jersey law does not require an intentional act standard and this Court did apply the correct standard of "substantial certainty" in rendering its decision. *See July 17, 2014 Transcript, Page 13, Line 22 to Page 16, Line 25.*

In order to determine whether the circumstances of Bada's injury met this "substantial certainty" standard, the New Jersey Supreme Court has established a two-step analysis which is comprised of a "conduct prong" and a "context prong." *Van Dunk*, supra., at 972. The "conduct prong" looks simply to "the employer's conduct in the setting of the particular case." *Id.* The "context prong" looks to whether "the resulting injury or disease, and the circumstances in which it is inflicted on the worker, [may] fairly be viewed as a fact of life of industrial employment, or whether it is plainly beyond anything the legislature could have contemplated as entitling the employee to recover only under the Compensation Act." *Id.* Moreover, "determining whether the context prong has been satisfied 'is solely a judicial function.'" *Mull v. Zeta Consumer Products*, 176 N.J. 385, 392, 823 A.2d 782, 786 (2003).

There are numerous cases where the employer's conduct was found not to rise to levels of "substantial certainty" in terms of either the conduct or context prongs: *Tomeo v. Thomas Whitesell Const. Co., Inc.*, 823 A.2d 769 (N.J. 2003) (affirming summary judgment for

9

employer despite the fact that employer deactivated safety lever on a snow blower); *Morales v. Schneider*, 2013 WL 6569790 (N.J. Super. Ct. App. Div. Dec. 16, 2013) (per curiam) (affirming summary judgment for employer after employee was injured when colleague "drove for 'more than a full block' [against traffic]," resulting in an accident that caused "grievous injuries" to plaintiff); *Estate of Sellino v. Pinto Bros. Disposal, LLC*, 2013 WL 5300076 (N.J. Super. Ct. App. Div. Sept. 23, 2013) (per curiam) (affirming summary judgment for employer even though it had tampered with truck safety feature in manner than contributed to accident).

*Van Dunk* clearly illustrates the difficulty of satisfying both the conduct and context prongs to overcome the prohibitions of the Worker Compensation Act. In *Van Dunk*, a worker who was directed by a supervisor to enter a trench that the supervisor had, earlier that day, directed the worker to avoid when the employee volunteered to straighten out some fabric inside the trench and was injured. This incident resulted in the issuance of a "willful violation" citation from OSHA and the court even noted the employer's actions could rise to a level of "gross negligence." *Id.*, at 979. Despite this, the Court found that the incident did not meet the 'conduct' prong because the employee only needed to enter the trench briefly, and "[e]ven considering the other facts known to [the supervisor] at the time that could indicate the possibility of a cave-in, none singly or in combination provide an objectively reasonable basis for expecting that a cave-in almost certainly would occur during the brief time plaintiff was sent into the trench." *Id.*, at 979.

Further, the court found that Van Dunk's incident also failed to satisfy the 'context' prong as "one cannot reasonably conclude that the type of mistaken judgment by the employer and ensuing employee accident that occurred on this construction site was so far outside the bounds of industrial life as never to be contemplated for inclusion in the Act's exclusivity bar,"

10

and "not every intentional, or indeed willful violation of OSHA safety requirements constitutes [such a wrong]." *Id.* at 980.

Mr. Bada worked outdoors and that would include working in inclement weather as a regular part of his job. *N.T. Bada Dep.*, 119:17-19. He was not ordered by his supervisor, John Gonzalez, to climb the ladder. Mr. Gonzalez, in fact, sent a more experienced colleague, Chris Aten, to assist Mr. Bada at the location. He was injured when it was determined that climbing the ladder under these conditions would not be safe. Mr. Bada admitted he never climbed the ladder and had been requested by Mr. Aten "to brace the side of the ladder while he unhooked it and lowered the extension ladder." *N.T. Bada Dep.*, 200:22-201:10.

Mr. Bada was never forced to climb the ladder or engage in any activity where serious injury or death was substantially certain. Based upon the facts, it can be reasonably concluded that Mr. Bada's injury occurred solely within the course and scope of his employment and within the bounds of industrial life. As a result, his claim falls squarely within the confines and remedies available to him as an incident contemplated by the legislature under the New Jersey Worker Compensation Act. In light of this, Defendants are entitled to judgment in their favor.

Plaintiffs have also raised the issue that the Defendants improperly supported their Motion for Summary Judgment solely with deposition testimony.

Plaintiffs argued that there is a genuine issue of material fact due to the credibility of the Defendants' employee, John Gonzalez, and that credibility issues must be determined at trial. In support of this position, the Plaintiffs relied upon, but have misread the holding of, *Borough of Nanty-Glo v. Am. Sur. Co. of New York*, 309 Pa. 236, 238, 163 A. 523 (1932). The *Nanty-Glo* rule has no application in the instant matter.

11

The Superior Court, in discussing the *Nanty-Glo* rule, has determined that "[t]he *Nanty-Glo* rule means the party moving for summary judgment *may not rely solely upon its own testimonial affidavits or depositions*, or those of its witnesses, *to establish the non-existence of genuine issues of material fact*. Testimonial affidavits of the moving party or his witnesses, not documentary, even if uncontradicted, will not afford sufficient basis for the entry of summary judgment, since the credibility of the testimony is still a matter for the [factfinder]." *DeArmitt v. New York Life Ins. Co.*, 2013 PA Super 161, 73 A.3d 578, 595 (2013). [Emphasis added.]

Here, the Defendants have offered both testimonial and documentary evidence from witnesses other than their own and the *Plaintiff himself* in support of their Motion for Summary Judgment. This Court primarily looked to the testimony of Mr. Bada in making its ruling and not solely upon the testimony of Mr. Gonzalez. As such, this clearly shows that the *Nanty-Glo* rule is not applicable in this case. In light of the foregoing, Plaintiffs' argument on this issue is without merit.

Lastly, Plaintiffs argue that summary judgment should not have been granted as to Kimberly Bada's loss of consortium claim, which is derivative to Mr. Bada's claims.

Under both Pennsylvania and New Jersey law, a derivative loss of consortium claim fails if the originating claim fails. *Sciarrotta v. Global Spectrum*, 944 A.2d 630, 633 (N.J. 2008); *Barchfeld v. Nunley by Nunley*, 577 A.2d 910, 912 (Pa. Super. Ct. 1990) ("[A]n action for loss of consortium is derivative of the injured spouse's claim."). Since Mr. Bada's claims cannot survive summary judgment, Kimberly Bada's loss of consortium claim must also be dismissed. *Bergen v. Able Energy, Inc.*, 2009 WL 222943 (N.J. Super. Ct. App. Div. Feb. 2, 2009) (per curiam) (affirming summary judgment of tort claims and loss of consortium claim because the tort claims are barred by Worker's Compensation Act).

12

For all of the forgoing reasons, this Court requests that its findings and conclusions be upheld on appeal.

BY THE COURT:

_____ J.
ANGELO J. FOGLIETTA

Date: January 20, 2015